FELICIA WILSON,

        Plaintiff,

      v.

HISPANIC HOUSING DEVELOPMENT
CORPORATION,

        Defendant.

No. 20 CV 1044

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Felicia Wilson worked as a resident service coordinator at a property run by defendant Hispanic Housing Development Corporation. Wilson alleges that the property manager at her workplace harassed her based on her race (African American) and skin color. Tension between Wilson and the property manager eventually boiled over, and, in an incident caught on camera, Wilson berated the property manager for transferring a phone call incorrectly and banged her fist on the desk in front of other employees. Defendant's Human Resources Manager reviewed the footage and fired Wilson for insubordination and aggressive behavior. Wilson, acting pro se, sues defendant under Title VII for race and color discrimination and for fostering a hostile work environment. Defendant moves for summary judgment on all claims. For the reasons that follow, the motion is granted.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts and draw all inferences in favor of the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020). Although I need only consider the materials cited by the parties, I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.    Evidentiary Issues

Local Rule 56.1 requires the moving party to file a statement of facts that it believes entitle that party to judgment as a matter of law. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a)(2), (d). The nonmoving party must file a response to that statement, and admit or dispute each asserted fact. N.D. Ill. Local R. 56.1(e)(2). If the responding party disputes the fact, it must cite to specific parts of the record to controvert the fact, and explain how the cited material controverts the asserted fact. *Id.* 56.1(e)(3). Failure to properly controvert a fact results in its admission. *Id.*; *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard new facts and legal arguments in responses, with the exceptions of objections based on materiality, admissibility, or lack of evidentiary support. N.D. Ill. Local R. 56.1(e)(2).

When a party moves for summary judgment against an unrepresented party, the moving party must serve the pro se litigant with a notice under Local Rule 56.2, which defendant did here. [45]. That notice explains the process of admitting or disputing facts, and instructs litigants that if they wish to submit testimony from

2

witnesses, the testimony must be in the form of an affidavit, which must be signed and notarized, or a declaration, which must be signed and include language from 28 U.S.C. § 1746. N.D. Ill. Local R. 56.2, II. The notice also instructs pro se litigants to review Local Rule 56.1. Courts must construe pro se filings liberally, but even pro se litigants must follow procedural rules. *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 n.2 (7th Cir. 2019).

Wilson largely complied with the local rules by filing a response to defendant's statement of facts and submitting her own statement of additional facts. (She also filed a second statement of additional facts.) Most of her objections to defendant's asserted facts are overruled, however. She disputes several facts because defendant's citations are, in her view, incomplete and should include other citations. *See* [53] ¶¶ 9, 16–17, 19, 21, 24, 26–29, 32–33, 35–38, 41, 44–45, 56, 65, 67, 69–72, 74–79.[1] It's not a proper basis to dispute a fact by pointing out other citations that supplement the offered fact, or point to an additional fact. So defendant's facts are largely admitted over Wilson's objections. Further, she doesn't explain how any of the record materials she cites to controvert the asserted fact. *See* N.D. Ill. Local R. 56.1(e)(3) (the party disputing a fact must "concisely explain how the cited material controverts the asserted fact").

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are taken from Wilson's response to defendant's Local Rule 56.1 statement of facts, [53], and defendant's response to Wilson's statement of additional facts and amended statement of facts, [57], where both the asserted fact and the opposing party's response are set forth in one document.

To support her own asserted facts, Wilson relies on mostly inadmissible evidence. Evidence supporting or opposing summary judgment must be admissible if offered at trial, except that depositions and other written testimony can substitute for live testimony. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). I may consider "properly authenticated and admissible documents or exhibits" in a summary-judgment proceeding. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Under Federal Rule of Evidence 901(a), to authenticate an item of evidence, the proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *United States v. Jackson*, 940 F.3d 347, 351 (7th Cir. 2019) (quoting Fed. R. Evid. 901(a)).

Most of Wilson's exhibits lack foundation or authentication. For example, she attaches excerpts from what appear to be government guidebooks or handbooks, an exhibit that's two pages of handwritten notes, and several unsigned statements or emails from witnesses. [53] at 23, 25, 29, 70. Those aren't admissible. The performance correction notices she attaches regarding Michael Sanchez, the former property manager who she identifies as a comparator, [53] at 87, 90, appear to be authentic, and defendant doesn't challenge their authenticity. [58] at 9. So those are considered part of the summary-judgment record. Most of Wilson's additional facts are not considered. In addition to largely relying on inadmissible evidence, many of

her facts are legal argument, *see* [57] ¶ 14, 16, 18, 20–22, 25, or are not supported by the exhibit she cites to.

Wilson moves under Federal Rule of Civil Procedure 56(e) for another opportunity to support her asserted facts and exhibits. [59], [60]. Under that rule, when a party fails to properly support an assertion of fact, a court "may" allow a litigant another opportunity to do so. Fed. R. Civ. P. 56(e)(1). Wilson's motions are denied. Defendant properly served Wilson with an explanation of how to present admissible evidence, and Wilson has had two opportunities to do so. Further, denial of the motion doesn't prejudice Wilson. For the reasons discussed below, admitting her inadmissible evidence, or allowing her to refile the evidence after properly authenticating it, wouldn't change the outcome of the case. Most of her unauthenticated exhibits corroborate facts that aren't in dispute, or address issues that don't bear on the elements of the claims she brings. So those exhibits don't advance her hostile-work-environment or discrimination claims. Further, defendant took most of its asserted facts from Wilson's own deposition. So there is admissible evidence from which Wilson's perspective and testimony have been presented and fully considered.

## III.   Background

Defendant was a nonprofit formed to create affordable housing for minorities, particularly in Hispanic communities. [53] ¶ 1. Defendant managed Continental Plaza, a senior and multi-family residential facility. [53] ¶ 2. Wilson began working there as a resident service coordinator in July 2011. [53] ¶ 3. When she started, she received a copy of defendant's employee handbook and took a harassment training

session. [53] ¶ 31. The handbook encouraged employees to talk to management about issues and concerns. [57] ¶ 16. The majority of employees at Continental Plaza were African-American. [53] ¶ 7.

Wilson's direct supervisor, the director of property management operations, worked at defendant's main headquarters. [53] ¶ 5. The on-site supervisor at Continental Plaza was the property manager; Wilson typically took direction from that person. [53] ¶ 6; [43-2] at 3 ¶ 7. Five property managers worked at Continental Plaza during Wilson's employment there, including Michael Sanchez and Carolyn Bridges, who became property manager in 2017. [53] ¶¶ 8, 14. Wilson complained to her supervisor at headquarters about four of the five property managers she worked with, but did not believe three of the four she complained about discriminated against her on the basis of race or color. [53] ¶ 12. All of the property managers also received a copy of the employee handbook. [57] ¶ 17.

In 2014, Sanchez, the property manager at the time, asked Wilson to come to the property management office. [53] ¶ 75. Wilson refused, and, in response, Sanchez reprimanded her in a hostile and aggressive way, standing so close to her that he was spitting on her face. [53] ¶¶ 74–75. Wilson complained about Sanchez's behavior to her supervisor. [57] ¶ 3; [43-3] at 184:21, 186:18–21. Sanchez continued to work for defendant for almost a year. [57] ¶¶ 4, 19. Wilson believed that defendant treated Sanchez better than her because Sanchez, who was Hispanic, had lighter skin. [53]

¶ 74; [57] ¶ 19. Defendant's HR manager did not review the altercation between Sanchez and Wilson. [53] ¶ 77.[2]

Bridges, the property manager who began in 2017, was African-American and had lighter skin than Wilson. [53] ¶ 15. Wilson's interactions with that property manager were "rocky" initially, but then improved. [53] ¶ 16. Many employees found the property manager abrasive. [53] ¶ 17. Shortly after the property manager began working at Continental Plaza, Wilson's supervisor discouraged the on-site employees from complaining about the property manager and directed them all to work it out amongst themselves. [43-3] at 62:12–64:10.

In July 2017, the property manager told Wilson that she (the property manager) "didn't care for her dark-skinned sister" and her "dark-skinned sister didn't care for her," but the two were starting to get along. [53] ¶ 19. A few months later, in November, the property manager told Wilson that a resident's daughter, who was African-American and had light skin, had ignored Wilson because of Wilson's "complexion." [53] ¶ 20. Sometime in March or April of 2018, the property manager told Wilson that Wilson's wig did not look right on her because of her "complexion." [53] ¶ 21. Wilson also heard the property manager refer to another employee's "black

---

[2] Wilson disputes this, but the evidentiary material she cites to doesn't properly controvert the asserted fact. For example, she cites to several sections of her deposition that she says defendant should have included. But those sections reference the HR manager's handling of *her* verbal altercation; they don't establish that the HR manager ever knew about the incident with Sanchez. *See, e.g.*, [43-3] 149:1–7, 156:4–157:3. She also cites to defendant's code of conduct and the employee handbook, but those exhibits don't controvert the fact either. A general code of conduct or set of procedures doesn't establish that the specific HR manager referenced here in fact reviewed a certain incident. So the fact that the HR manager had no knowledge of the altercation between Sanchez and Wilson is admitted.

ass" two times. [53] ¶¶ 24–25. The property manager went into Wilson's locked office without asking permission. [53] ¶ 23. Wilson did not report any of these comments to management or human resources. [53] ¶ 37.

In early 2018, the property manager asked Wilson to complain to HR about an administrative assistant's unprofessionalism, and Wilson refused to do so. [53] ¶¶ 18, 36; [43-3] at 47:2–49:13. After that incident, Wilson believed the property manager began targeting her. [53] ¶¶ 18, 36. In 2018, Wilson was late for work 10 to 20 times. [53] ¶ 29. She believed that her coworkers were also arriving late, but doctoring their time sheets to appear that they were on time. [53] ¶ 32. On May 17, 2018, Wilson refused to doublecheck her timesheet when the property manager asked her to, and the property manager complained to HR that Wilson had been loud, unruly, and disrespectful. [43-2] at 99–100; [43-2] at 3 ¶ 9. The next day, Wilson photocopied her coworkers' timecards. [53] ¶ 32. The property manager discovered the photocopying and threatened to report Wilson to HR. [53] ¶ 33.

On May 21, Wilson emailed her supervisor and HR manager listing a number of complaints about the property manager. [53] ¶¶ 34–36; [43-3] at 152–53. She reported, among other things, the property manager's "malicious mischief," "abuse of power," "disparaging treatment," and "refusal to cooperate with coworkers"; accused her of purposely creating a "an intimidating hostile and/or offensive work environment"; cited her favoritism of certain employees and residents; and said that after Wilson declined to report their other coworker for unprofessionalism, the property manager retaliated by rejecting everything Wilson asked for. [43-3] at 152–

53. The email did not mention any comments that the property manager had made about Wilson's skin color. [53] ¶¶ 35–36.

The next day, Wilson went to the property management office to find out who had transferred a phone call to her. [53] ¶ 38. The property manager said she had transferred the call, and Wilson told her to screen calls before transferring them. [53] ¶ 40. The property manager refused. [53] ¶ 40. Wilson raised her voice, accused the property manager of being petty and unprofessional, and said she "wasn't scared" of her. [53] ¶ 41. Wilson was angry, and as video captured in the lobby portrays, she waved her arms, pointed at the property manager, raised her voice, and hit her fist on the desk three to five times while yelling. [53] ¶¶ 42–51. The incident occurred in front of other employees and within earshot of tenants in the building. [43-2] at 99–100.

Twenty minutes later, defendant's HR manager called Wilson and sent her home. [53] ¶ 52. That night, Wilson emailed her supervisor and the HR manager explaining that the property manager had been targeting her and acting petty. [53] ¶ 54. She sent a second email admitting that she hit the desk with her hand. [53] ¶ 55.

The HR manager reviewed the video footage and obtained statements from Wilson, the property manager, and two witnesses. [53] ¶¶ 56–57.[3] Based on Wilson's

---

[3] Wilson objects to facts 57–64 as hearsay. The HR manager submitted a sworn affidavit, which is admissible testimony on summary judgment, so her statements about what she reviewed and the conclusions she came to based on that review are not considered out-of-court statements for hearsay purposes. *See* Fed. R. Civ. P. 56(c)(1)(A). I need not address Wilson's hearsay objections to the substance of the witness statements, because defendant

behavior, the HR manager found that Wilson acted aggressively toward and yelled at the property manager, violating defendant's employee conduct policy. [53] ¶¶ 60–65, 68. The HR manager found this conduct to be "completely inappropriate" for the workplace and decided to terminate Wilson's employment. [53] ¶ 62; [43-2] at 5 ¶ 16. The parties dispute whether the property manager was involved in the decision to fire Wilson. According to the HR manager, the property manager made no recommendation about whether to fire Wilson. [53] ¶¶ 66–67. Wilson points to an email the property manager sent to Wilson's supervisor and the HR manager the day of the incident, which described the property manager's side of the event and ended with, "I can no longer tolerate behavior of this sort." [43-2] at 23.[4]

In June 2018, the HR manager gave Wilson a notice terminating her employment. [53] ¶ 68. The notice cited her for responding to the property manager's request to correct her timesheet by being "loud, unruly & disrespectful." [43-2] at 99–100. It noted that before HR could address that issue, Wilson "created another major disruption" by becoming "very disrespectful" toward the property manager, being "loud and disruptive," and "banging" her fists on the desk in front of other employees and residents. [43-2] at 99–100. Wilson testified that she believed she was fired

---

does not rely on those facts in its argument. And Wilson doesn't dispute what happened during the incident, which was captured on video, so additional witness statements documenting what happened don't create any issue of material fact.

[4] Defendant doesn't challenge the admissibility of the property manager's email. The statement is properly offered as a statement of a party opponent made in the course of an employment relationship. *See* Fed. R. Evid. 801(d)(2)(D).

because she sent the email complaining about the property manager on May 21. [53] ¶¶ 70–72.

## IV. Analysis

Wilson filed a pro se complaint alleging race and color discrimination and hostile work environment under Title VII. She filed her claims with the Illinois Department of Human Rights and the EEOC, and the EEOC adopted the state agency's findings and issued her a right-to-sue letter. [10] at 7.[5]

### A. Discrimination

Title VII prohibits an employer from discriminating against any individual because of that person's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The question is whether a plaintiff has introduced evidence from which a reasonable factfinder could find that the plaintiff's race, ethnicity, color, sex, or national original "caused the discharge." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.,*

---

[5] Wilson also appears to suggest that defendant unlawfully retaliated against her under Title VII—she contends that she was fired in return for emailing her supervisor and HR on May 21 to complain about the property manager. It's not clear whether Wilson exhausted her administrative remedies on a retaliation claim. *See Chaidez v. Ford Motor Co.,* 937 F.3d 998, 1004 (7th Cir. 2019). Her pro se complaint initiating this lawsuit and attaching her right-to-sue letter did not check the "retaliation" box. [1], [10]. Defendant offers an Illinois Department of Human Rights "Charge of Discrimination" form that's signed, notarized, and dated June 6, 2018, in which Wilson details her discrimination claim, but does not mention retaliation. [57-1] at 7–8. She also agreed in that document to cross-file with the EEOC. Wilson insists that she amended her IDHR complaint, and submits a signed IDHR "Complainant Information Sheet" dated May 29, 2018 that includes comments in the "retaliation" box. [57] ¶ 1; [51] at 6. It's not clear how these documents relate to each other. Regardless of whether Wilson exhausted a retaliation claim, such a claim would not survive summary judgment. Title VII prohibits employers from discriminating against an employee because she has opposed a practice made unlawful by Title VII. *Skiba v. Ill. Cent. R.R. Co.,* 884 F.3d 708, 718 (7th Cir. 2018). Wilson has not marshaled evidence from which a jury could find that she engaged in any protected activity. Her May 21 email was not complaining about a practice made unlawful by Title VII, such as race or color discrimination. So there's no viable retaliation claim here, notwithstanding exhaustion.

988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)). A plaintiff may provide either direct or indirect evidence of discrimination.

One way of proving discrimination is the burden-shifting method of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under that approach, a plaintiff must make a prima facie showing of discrimination by showing that: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside the protected class received better treatment. *Igasaki*, 988 F.3d at 957. If the plaintiff makes that prima facie showing, the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show the motive was pretextual. *Id.* A plaintiff need not use the *McDonnell Douglas* framework. *Id.* Whether direct or indirect, all evidence "must be evaluated as a whole." *Id.* (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016)). The question is whether "the totality of the evidence shows discrimination, eschewing any framework or formula." *Id.* at 958.

Wilson's claims fail under both methods of proof. Beginning with the indirect method, there's no dispute that Wilson was in a protected class, nor that being fired is an adverse employment action. But she presents no evidence from which a jury could find that she met defendant's employment expectations. Wilson testified that she believed her job performance was satisfactory, but her own self-assessment is not evidence a jury could reasonably rely on. *See Sklyarsky v. Means-Knaus Partners,*

*L.P.*, 777 F.3d 892, 897 (7th Cir. 2015) (plaintiff's "own opinion about his work performance" was "irrelevant"). And much of the evidence suggests that Wilson was underperforming. First and foremost, the video speaks for itself. Wilson doesn't dispute that she was angry, hit the desk, or raised her voice to the property manager in front of other employees or residents. Beyond that incident, Wilson was late 10 to 20 times in 2018; became disrespectful when the property manager asked her to check her timesheet; secretly photocopied other employees' timecards; and had had problems with almost every property manager she had worked with. Performance reviews from 2011 to 2013 cited her for being late two to three times a week, not performing the number of assessments she was supposed to, and substandard work performance. [43-3] at 39:10–42:10, 44:11–46:8; [51] at 39. Without some evidence other than her own testimony to show satisfactory work performance, there's no genuine dispute about whether Wilson was meeting her employer's legitimate employment expectations—all the available evidence shows that she wasn't. *See Igasaki*, 988 F.3d at 958 (granting summary judgment to employer where evidence showed plaintiff's job performance was "at best, lackluster, and at worst, unacceptable").

Nor could a reasonable jury find that defendant treated a similarly situated comparator differently. A comparator must be directly comparable to the plaintiff in all material respects, though they need not be "identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012); *see Igasaki*, 988 F.3d at 958. This requirement is satisfied if the differences between the plaintiff and the comparator are not "so significant that they render the comparison effectively useless." *Coleman*, 667

F.3d at 846 (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). In assessing comparability, courts consider whether the employees held the same job description, were subject to the same standards, and were subordinate to the same supervisor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692–93 (7th Cir. 2005).

Wilson identifies Sanchez, the former property manager, as a similarly situated comparator. Defendant doesn't dispute that Sanchez aggressively yelled at Wilson in close proximity to her face. Wilson complained about the incident, but Sanchez, who was Hispanic, worked for defendant for 10 more months following that altercation. Wilson contends that she and Sanchez committed the same infraction, but defendant fired her and not Sanchez due to preference for lighter-skinned employees.

There are some similarities between Sanchez and Wilson. A jury could find that their conduct was similarly serious, and they received copies of the same employee handbook, so presumably were subject to the same standards. That they had different job titles isn't meaningful here—though Sanchez was a property manager, not a resident services coordinator, nothing about their job titles makes objectively inappropriate behavior any more or less justified. *See Coleman*, 667 F.3d at 848 (finding difference in job titles "irrelevant"). The comparison falls apart, however, because different people addressed Sanchez and Wilson's respective situations. The HR manager who fired Wilson had no role in evaluating the verbal altercation between Sanchez and Wilson. And the property manager who Wilson accuses of harboring the discriminatory animus that led to her termination began working for defendant years after Sanchez had left. Sanchez reported to a different

supervisor than Wilson did. [53] at 87. Where different decisionmakers were involved in evaluating the respective verbal outbursts, Wilson hasn't presented sufficient evidence from which a jury could find that she and Sanchez were similarly situated in a meaningful way.

Even if Wilson had made a prima facie showing of discrimination, defendant would still be entitled to summary judgment. Defendant has offered a legitimate, nondiscriminatory reason for firing Wilson: Wilson raised her voice to the property manager and hammered on the desk, in front of another employee and within earshot of tenants in the building. The HR manager found that this inappropriate conduct alone justified Wilson's firing, and Wilson fails to identify evidence from which a jury might find that reasoning to be a lie. Wilson must identify "weaknesses, implausibilities, inconsistencies, or contradictions" in defendant's reasoning, such that a reasonable person could find it unworthy of credence. *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2021) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). She hasn't done so. Defendant's explanation for Wilson's termination comes from a signed affidavit by its HR manager, who testified that she independently decided to fire Wilson based on her review of the video and witness statements. [43-2]. Wilson doesn't undermine the HR manager's credibility—none of the incidents Wilson had with management implicated the HR manager, and there's no suggestion that she personally had any discriminatory animus toward Wilson or any reason to lie. But Wilson points to the property manager's email to HR stating that the property manager could no longer tolerate Wilson's behavior as evidence from which a jury might find that it was the property manager who

decided to fire Wilson. Though there's no evidence that HR relied on that email in any concrete way, I draw inferences in Wilson's favor, and a jury might infer from the email that the property manager at least influenced the decision. But contributing to a decision is not the same as making it. And even if a jury found that the HR manager considered the property manager's opinion, there's no evidence that the property manager expressed any racial or color-based animosity about Wilson to HR. That the property manager harbored discriminatory animus doesn't undermine the HR manager's justification for firing Wilson, because there's no evidence that the HR manager shared or knew about that animus or lacked independence in reaching the employment decision. So Wilson's discrimination claim cannot survive summary judgment under the indirect method.

Wilson fares no better under a holistic review. In discrimination cases, "the sole question that matters" is "causation, and thus intent." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). The totality of the evidence shows that Wilson was fired because she acted aggressively toward another employee, not because of discriminatory animus. Wilson doesn't dispute that the video accurately portrays the incident—it shows her pointing and gesturing at the property manager, hitting the desk with her fist, and stepping toward the property manager. Though the video has no sound, Wilson admits that she was yelling. That the undisputed evidence shows Wilson acting inappropriately rebuts any suggestion of discriminatory termination.

To be sure, a jury could find that the property manager with whom Wilson had the verbal altercation made inappropriate, offensive comments when she remarked on Wilson's skin color, demeaned people with darker skin, like her sister, and referred

to other employee's "black ass." But for the same reasons Wilson can't show pretext, she also can't establish that she was fired because of unlawful discrimination. A jury could not connect the property manager's racial or color bias to Wilson's termination.

Finally, Wilson doesn't dispute that the vast majority of employees at Continental Plaza were black, nor that a black person replaced her. Of course, those facts alone wouldn't preclude a discrimination claim, but they lend marginal support to the legitimacy of defendant's actions; in other words, that Wilson's termination was due to her own behavior, not to any race- or color-based bias directed against her.

### B.    Hostile Work Environment

To establish that she suffered from a hostile work environment, Wilson must show that (1) she was subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by Title VII; (3) the harassment was so severe and pervasive that it altered the conditions of her employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. *Smith v. Ill. Dep't of Trans.*, 936 F.3d 554, 560 (7th Cir. 2019); *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 904 (7th Cir. 2018).

A reasonable jury could find that Wilson was subject to unwelcome harassment based on her skin color—defendant doesn't dispute that the property manager commented on Wilson's skin color multiple times. The property manager directly referenced color twice: she said that a client's family had ignored Wilson because of her color, and that Wilson's wig didn't match her complexion. The comments occurred in November of 2017 and April or March of 2018, respectively. The property manager made the third comment Wilson relies on in July of 2017, when she admitted disliking

her darker-skinned sister. It might have been unreasonable for Wilson to interpret a comment made about another person as harassment directed at her, but viewed in context of the property manager's other commentary on Wilson's skin color, a jury could reasonably find that comment to be unwelcome harassment based on a protected characteristic. Wilson also heard the property manager twice refer to other employees by the term "black ass."

The record is unclear about supervisory liability. An employer is strictly liable for discriminatory acts perpetrated by supervisors, but is only liable for the discriminatory acts of coworkers if the employer is negligent in discovering or remedying the harassment. *Johnson*, 892 F.3d at 904. The plaintiff bears the burden of showing that the employer knew about the problem and did not act reasonably to address it. *Id.* The harasser is a supervisor if the employer has empowered her "to take tangible employment actions against the victim," such as hiring, firing, failing to promote, reassignment of responsibilities, or changing employee benefits. *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013).

Some evidence suggests the property manager was authorized to take tangible employment actions. The HR manager's affidavit describes the property manager as the "on site supervisor" at Continental Plaza. [43-2] at 3 ¶ 7. Wilson testified that, generally, she was obligated to report some things to, and to take direction from, the property manager. [43-3] at 23:19–24:9. Both her direct supervisor at headquarters and the property manager prepared her yearly evaluations. [43-3] at 33:13–19. At the same time, Wilson testified that her supervisor at headquarters was "very clear that

she was the supervisor," [43-3] at 23:22–24, suggesting that the property manager was closer to a coworker. There doesn't appear to be any evidence that the property manager had authority over hiring, firing, or promotions, or could reassign Wilson or change her benefits. For example, according to defendant, it was the HR manager who exercised the authority to fire Wilson; the property manager had no role in that decision. [53] ¶ 5. (A fact that's disputed as noted above.) Still, the record is incomplete regarding the property manager's scope of authority, and there's some evidence from which a jury could find a supervisory connection to the conduct.

If a jury found that the property manager was a coworker, not a supervisor, Wilson would have to show that defendant was on notice of the alleged harassment and failed to remedy it. Wilson hasn't made that showing. There's no evidence that Wilson mentioned the property manager's race- or color-based comments to anyone in HR or management. To be sure, Wilson complained to her supervisor and to HR that the property manager was petty, unprofessional, retaliatory, and so on. But Wilson would have to offer some evidence that she raised an issue with race- or color-based harassment and defendant ignored her complaints to establish supervisory liability based on harassment by a coworker.

Ultimately, supervisory liability doesn't matter here. To survive summary judgment, Wilson must show that a reasonable jury could find that she was subject to harassment based on a protected characteristic that was so severe or pervasive it altered her conditions of employment. *Johnson*, 892 F.3d at 900. Courts look to the severity of the allegedly discriminatory conduct, its frequency, whether it was

physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with an employee's work performance. *Id.* "Offhand comments, isolated incidents, and simple teasing" do not rise to the level of severe or pervasive harassment. *Id.* (quoting *Passananti v. Cook Cty.*, 689 F.3d 665, 667 (7th Cir. 2012)); *see also Tyburski v. City of Chicago*, 964 F.3d 590, 602 (7th Cir. 2020) (personal animosity or juvenile behavior by coworkers isn't severe harassment). Sometimes courts assess whether the harassment was both objectively and subjectively offensive; either way the test is articulated, the inquiry is the same. *Johnson*, 892 F.3d at 900.

No reasonable jury could find that the three to five comments in this case, made over the course of almost a year, were so severe that they altered Wilson's working conditions. None of the comments were physically threatening, and, while undoubtedly demeaning, none of the comments involved a severe insult. That the comments occurred months apart undermines Wilson's insistence that color-based harassment so pervaded the workplace that it altered her working conditions. Further, only two comments were directed at Wilson—one of the color-based comments was about the property manager's sister, and the "black ass" remarks referred to other employees. Those comments are relevant, but harassment "directed at someone other than the plaintiff" generally carries less weight in evaluating a hostile-work-environment claim. *Johnson*, 892 F.3d at 902 (quoting *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001)). Overall, no jury could find that these two direct and three indirect comments constituted severe or

pervasive harassment. *See Tyburski*, 964 F.3d at 602 (subordinates' eight or nine age-related comments over several years weren't sufficiently threatening or pervasive to sustain age-discrimination claim on summary judgment); *Ford v. Marion Cty. Sheriff's Off.*, 942 F.3d 839, 856–57 (7th Cir. 2019) (two disability-related comments were offhand, isolated comments, not severe harassment).

Wilson points to other acts of her property manager, such as going into Wilson's office without permission and commenting on Wilson's weight. But Title VII "does not give employees a remedy for workplace abuse unrelated to a protected characteristic." *Smith*, 936 F.3d at 561. Wilson must rely on evidence that she suffered harm from the race- or color-based harassment that was "additional or different" from the harm she was suffering due to her other issues with the property manager. *Id.* at 562. Put another way, Wilson points to no evidence that she found the workplace subjectively intolerable because of race- or color-based harassment. For example, she testified that her relationship with the property manager was initially rocky, improved for several months, then took a turn around January of 2018 when Wilson declined to help the property manager report the administrative assistant. [43-3] at 47:2–49:13. That two of the color-related comments Wilson now relies on occurred in 2017, before her relationship with the property manager began to devolve, undercuts her insistence that it was those comments that made her workplace subjectively hostile. And Wilson admits she didn't report any of the comments about race or skin color to upper management. Granted, a jury could find that Wilson believed she wasn't allowed to complain, so her not reporting the comments wasn't particularly reflective of her

subjective experience. But when Wilson did email her supervisor and HR about the property manager on May 21, she listed a number of grievances and never mentioned race- or color-based harassment. Even when drawing inferences in Wilson's favor, the omission of any race-based complaints in her email is the absence of evidence that supports her claim.

Evidentiary issues aside, Wilson has gathered evidence that her property manager was unreasonable, unprofessional, and abrasive, but that fact isn't in dispute. [57] ¶ 17.[6] Title VII doesn't recognize a cause of action for having a bad boss. No reasonable jury could find that it was the property manager's race- or color-based comments that created the abusive working environment. *See Smith*, 936 F.3d at 561 (granting summary judgment to employer where plaintiff's "supervisors made him miserable throughout his employment," but he had no evidence that they did so "because he was black"); *Abrego v. Wilkie*, 907 F.3d 1004, 1015–16 (7th Cir. 2018)

---

[6] As noted above, the accounts from Wilson's coworkers don't create a factual dispute because they don't establish that the property manager's race- or color-based harassment was severe or pervasive—the accounts merely corroborate Wilson's insistence that the property manager was unprofessional and abrasive. For example, Wilson submits a letter from Eldridge Davis, who writes that he resigned his position because the property manager was "ruthless and unprofessional." [51] at 91. But nothing in the letter references race- or color-based harassment. Likewise, one of Wilson's additional exhibits is a letter from LaKesha Hamilton. [55] at 4. Hamilton writes that she saw "many biases, misconduct" and "injustices" while working at Continental Plaza; specifically, she notes that the property manager was "rude," "had a superior attitude," put her finger in staff members' faces when she talked to them, and was "cutthroat." [55] at 4–6. The only reference to race or color is Hamilton's belief that the property manager sought to fire the administrative assistant because of "color preference." [55] at 5. Wilson submits a letter from Dwight Smith, who also writes that the property manager was loud, unprofessional, and put her fingers in Wilson's face; Smith writes that he overheard the property manager say she would "do anything to get Felicia['s] black ass fired." [53] at 60. Wilson's other exhibits similarly fail to advance her hostile-work-environment claim.

(short-tempered, hostile, and disrespectful supervisors did not create an actionable hostile workplace where there was no evidence that harassment was based on race or sex).

## V.    Conclusion

Wilson's motions to properly support her asserted facts, [59] [60], are denied, and her motion to amend her additional facts, [54], is terminated as moot. Defendant's motion for summary judgment, [42], is granted. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: May 20, 2021